Argued and submitted July 31, 2007, remanded for resentencing;
otherwise affirmed February 20, 2008

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ROY LEE RETTMANN,
*Defendant-Appellant.*

Umatilla County Circuit Court
CF030273; A126893

178 P3d 333

Eric Johansen, Senior Deputy Public Defender, argued the cause for appellant. With him on the briefs were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense.

Anna Marie Joyce, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

ROSENBLUM, J.

## ROSENBLUM, J.

Defendant was convicted of, among other offenses, attempted aggravated murder, ORS 163.095; ORS 161.405, and assault in the second degree, ORS 163.175, after defendant cut his son's wrist with a knife. The trial court imposed consecutive sentences on those convictions pursuant to ORS 137.123(5)(b) on the ground that the attempted aggravated murder caused a qualitatively different loss to the victim. Defendant appeals, challenging the imposition of consecutive sentences. We remand for resentencing.

At the time of the offenses, defendant's son, C, was five years old. Defendant and C's mother, Tina, were married but had been separated for over a year. Defendant lived in Pilot Rock; Tina lived in Yakima, Washington. Tina had custody of C, and defendant had parenting time on the weekends. At the end of one of his parenting weekends, defendant was to meet Tina in Paterson, Washington, to return C to her. Defendant was distraught over not having more time with C. When Tina called him on his cell phone to tell him that she was at the meeting place, defendant told her that he was not bringing C to her. Tina began driving back to Yakima.

Defendant decided that, if he could not have C living with him all the time, he would kill himself and C. He pulled over and parked his pickup truck under a cell phone tower just outside of Hermiston. He got out of the pickup, took C out of the seat where he was sleeping, and cut C's right wrist with his pocket knife. Defendant then cut his own wrist.

Shortly thereafter, defendant found a pair of socks in C's bag and used them to bandage their wrists. He put C back into the pickup and drove away. At some point thereafter, defendant called Tina back and told her what he had done. Naturally, she became very upset. Defendant told her to calm down or she would never see C again. Tina asked him where he was. He said that he was driving along the Columbia River. She asked where the nearest hospital was. He said that it was in Hermiston but said that he was not going to go to the hospital until she met with him. Defendant gave her directions to the cell phone tower and told her to meet him

there. Tina turned her car around and drove there, which took approximately an hour. Defendant arrived at the cell phone tower at the same time.

Tina put C in her car, told defendant that he had to go with her, and then drove them to the hospital, which was about five minutes from the cell phone tower. On the way, defendant was crying and apologizing for what he had done. He told Tina that if he could not have his son, he was going to "end it."

Both defendant and C survived the injuries.

At the hospital, defendant was interviewed by Officer Smith of the Hermiston police. He told the officer that being separated from his son was extremely painful and that "if he couldn't spend all of his time with his son or living with his son, at least they could be together in spirit." Smith asked him if he had cut C's and his own wrists, and defendant told him that "he knew it didn't sound very good, but he just wanted to be with his son forever." Defendant later told an Oregon State Police detective, "I tried to take two lives."

Defendant was charged with attempted aggravated murder, first-degree assault, second-degree assault, first-degree kidnapping, and first-degree custodial interference. Following a bench trial, the court acquitted defendant of the kidnapping charge but found him guilty of attempted aggravated murder, two counts of second-degree assault,[1] and custodial interference. The court imposed a sentence of 120 months on the attempted aggravated murder conviction. It merged the two assault convictions and imposed a 70-month sentence thereon. It imposed probation for the custodial interference.

The prosecutor asked the court to order that the two prison terms be served consecutively. The prosecutor conceded that the offenses had occurred as part of a continuous and uninterrupted course of conduct, but he argued that consecutive sentences were permissible under ORS 137.123(5)(b) because the attempted aggravated murder had

---

[1] On the first-degree assault charge, the court found defendant guilty of the lesser included offense of second-degree assault.

caused or created a risk of causing greater or qualitatively different loss, injury, or harm to the victim:

> "An assault 2 injury could have been anywhere. It could have been—he could have scratched and caused injury to the boy, cut the boy anywhere, his ear, his upper arm. But he went for the wrist.
>
> "And he went for the wrist with the intention of committing murder.
>
> "So the notion that they're the same—that the attempted aggravated murder and the assault 2 would be the same loss, no. An assault 2 [results in a] loss to the victim because he suffers an injury with a dangerous weapon.
>
> "The qualitatively different loss for attempted aggravated murder is he is contemplating causing him to lose his life."

Defendant argued that the injury to the victim was the same for both offenses—namely, the cutting of his wrist—and that consecutive sentences were thus not authorized. The court adopted the prosecutor's reasoning and ordered that the sentence on the assault conviction to be served consecutively to the sentence on the attempted aggravated murder conviction.

On appeal, defendant challenges the imposition of consecutive sentences. He contends that this case is controlled by *State v. Warren*, 168 Or App 1, 5 P3d 1115, *rev den*, 330 Or 412 (2000), arguing that the single act of cutting C's wrist does not support the inference that he intended both to kill C and to cause him injury, and that the trial court did not make any other findings that support that inference. Defendant also argues that, under ORS 137.123(5)(b), the offense for which a consecutive sentence is contemplated must have caused or created a risk of causing some harm that was not caused or threatened by the other offense or offenses. Because the assault and the attempted aggravated murder were predicated on a single act, defendant contends that neither caused any harm that the other did not.

The state responds to both of defendant's arguments by asserting that this is not a "single act" case. It argues that a distinct risk attributable only to the attempted aggravated

murder arose when defendant drove C around for an hour without seeking medical attention. The state first asserts that defendant had both the intent to kill and the intent to cause injury when he cut C's wrist. It further contends, however, that, while driving around with C after cutting his wrist, defendant continued to have the intent to kill but not the intent to cause injury and, thus, that the risk of harm that arose while defendant was driving around—namely, the risk that C would bleed to death—is associated with the attempted aggravated murder but not with the assault. Thus, the state argues, the separate conduct associated only with the attempted aggravated murder created a risk of causing greater or qualitatively different harm than was threatened by the assault.

We begin with defendant's argument that this case is controlled by *Warren*. The reasoning of the trial court in this case is not the same as it was in *Warren*, so defendant's argument is not well taken. In *Warren*, the defendant was convicted of both attempted murder and first-degree assault after firing a single shot into the victim's head. 168 Or App at 3. The trial court imposed consecutive sentences under ORS 137.123(5)(b) on the ground that " '[h]aving the intent to kill creates a risk of causing greater and qualitatively different loss, injury, or harm than merely having the intent to cause serious physical injury.' " *Id.* at 4. On appeal, we noted that the trial court appeared to have relied on only one fact in inferring that the defendant had both the intent to kill and the intent to cause injury to the victim—namely, the fact that the defendant shot the victim in the head at close range with a gun. *Id.* at 6. We concluded that that fact alone did not support the inference that the defendant had both intents. Because the trial court made no other findings that could support that inference, we held that imposition of consecutive sentences was not authorized under ORS 137.123(5)(b).

In this case, the trial court did not reason that having the intent to kill creates a risk of causing greater harm than having the intent to cause injury, as the trial court in *Warren* did. Rather, it reasoned that defendant's intent to kill caused a greater harm than the *injury* caused by the assault. The court made no reference whatsoever to *intent* to cause

injury. Because the court's reasoning did not require an inference that defendant had both the intent to kill and the intent to cause injury, whether the court made findings that support such an inference is immaterial. For that reason, *Warren* is inapposite.

We turn to defendant's other argument. As noted, defendant contends that neither the assault nor the attempted aggravated murder caused or created a risk of causing any harm that the other offense did not also cause or threaten. We agree. ORS 137.123(5)(b) provides:

> "The court has discretion to impose consecutive terms of imprisonment for separate convictions arising out of a continuous and uninterrupted course of conduct only if the court finds:
>
> "* * * * *
>
> "(b)  The criminal offense for which a consecutive sentence is contemplated caused or created a risk of causing greater or qualitatively different loss, injury or harm to the victim or caused or created a risk of causing loss, injury or harm to a different victim than was caused or threatened by the other offense or offenses committed during a continuous and uninterrupted course of conduct."

To determine whether an offense "caused or created a risk of causing greater or qualitatively different loss, injury or harm" than another offense under the statute, a court must (1) determine which offense is the offense for which a consecutive sentence is contemplated; (2) compare the harms—real or potential—that arose from that offense with those that arose from the offense to which it will be sentenced consecutively;[2] (3) determine whether the offense for which a consecutive sentence is contemplated caused or risked causing any harm that the other did not; and, if so, (4) determine whether the harm that is unique to that offense is greater than or

---

[2] By "potential" harms, we mean harms that were risked, though not realized, by the conduct that actually occurred. We do not mean to suggest that it is appropriate to consider theoretical harms that an offense—as defined by statute but not as actually committed—could have caused, as the prosecutor appears to have suggested at the sentencing hearing. *See* 218 Or App at 183 (quoting the prosecutor as arguing that a second-degree assault "could have been anywhere" and that defendant "could have scratched and caused injury to the boy").

qualitatively different from the harms caused or threatened by the other.

We begin by stating the obvious: A single act produces only one set of harms, even if the act constitutes multiple offenses. For example, setting fire to a house with knowledge that a person is inside it can constitute both arson and attempted murder, but it produces only one set of harms: damage to the house, the risk of killing the person inside, the risk of the fire spreading to the neighbor's house, and so forth. Thus, the arson causes or creates a risk of causing the same set of harms that the attempted murder causes or creates a risk of causing, and vice versa. Where two offenses are predicated on the same act, logic will not support the conclusion that one offense caused or created a risk of causing some harm that the other offense did not. It follows that, if an act that is motivated by an intent to kill creates a risk of causing a particular harm, the same act cannot be said to create a risk of causing a different harm merely because the act can also be viewed as constituting an assault. The harm risked by that act is the same regardless of the intent of the actor. Here, whatever harms resulted from or were risked by defendant's act of cutting C's wrist were the same regardless of which offense the act is viewed as. In short, ORS 137.123(5)(b) does not authorize consecutive sentences for multiple offenses that arise out of a single act.[3]

We turn to the state's argument that this is not a "single act" case. That argument was not advanced in the trial court, and it assumes a fact that the trial court did not find—namely, that the act of cutting C's wrist did not by itself create a risk that C would bleed to death, a finding that would be necessary to conclude that the delay in seeking medical attention "created a risk of causing greater or qualitatively different loss, injury or harm." ORS 137.123(5)(b).

---

[3] In "single act" cases, consecutive sentences may be available under ORS 137.123(5)(a), which authorizes consecutive sentences if the court finds that the defendant had a "willingness to commit more than one criminal offense[.]" For example, in the arson/attempted murder hypothetical described above, a court could certainly find a willingness to commit more than one criminal offense. The state does not contend that ORS 137.123(5)(a) applies in this case.

As noted above, in imposing the sentences consecutively, the trial court adopted the reasoning of the prosecutor, who took the view that both offenses arose from the single act of cutting C's wrist. The prosecutor did not assert the fact that the state's position on appeal requires. Instead, he argued that a different harm arose from the attempted aggravated murder because defendant "contemplated causing [C] to lose his life" when he "went for the wrist with the intention of committing murder." Because the trial court adopted that view, there was no need for it to make the finding that the state's position on appeal requires, and it did not do so. *See State v. Brooks*, 187 Or App 388, 400, 67 P3d 426, *rev den*, 335 Or 573 (2003) ("ORS 137.123 contemplates findings made at the trial court level, not findings by an appellate court. This court does not engage in independent fact finding; nor do we second-guess what a factfinder might have done but did not do. When we encounter problems with factual findings in the context of sentencing, we remand."). Accordingly, we cannot affirm on the ground that the state advances on appeal.

Remanded for resentencing; otherwise affirmed.